UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

JOHN T. GLOVER,               )
                                    )
      Petitioner,        )
                                    )     No. 6:16-CV-282-KKC-REW
v.                              )
                                    )     RECOMMENDED DISPOSITION
DON BOTTOM, Warden,    )
                                    )
      Respondent.    )

\* \* \* \* \* \* \* \* \* \*

Petitioner, John T. Glover, is a Kentucky inmate. DE 4 (Amended Petition), at 2. On March 28, 2001, the Whitley Circuit Court entered judgment against Petitioner after a jury convicted him of murder, first degree robbery, and first degree arson. The court sentenced him to life without the possibility of parole for twenty-five (25) years. *See Glover v. Commonwealth*, 2000-SC-0664 (Ky. August 22, 2002) (unpublished opinion) (affirming Glover's conviction on direct appeal). On December 6, 2016, following much state process, Glover filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. DE 1; *see also* DE 4 (amending original petition). Warden Don Bottom responded on March 7, 2017, DE 11 (Answer), and Petitioner replied. DE 15 (Reply).

Having reviewed the submissions under the applicable standards, the Court **RECOMMENDS** that the District Court **DISMISS** the petition **WITH PREJUDICE** and **DENY** a Certificate of Appealability. Petitioner fails in all respects to justify displacing the treatment of the matter by the courts of the Commonwealth.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In May 2000, following a transfer from the Whitley District Court juvenile docket to the Whitley Circuit Court, a Whitley County grand jury indicted Glover for murder, first-degree robbery, and first-degree arson. *See Glover v. Commonwealth*, No. 2014-CA-000989-MR, 2016 WL 1178639, at *1 (Ky. Ct. App. Mar. 25, 2016), *review denied* (Sept. 15, 2016) (hereinafter *Glover II*). The Kentucky Court of Appeals articulated the underlying facts and case history through the conclusion of Petitioner's trial:

> During the early morning hours of May 27, 1998, Alice Sumner was found dead in her burning home. Subsequent investigation showed that she had been stabbed thirty-four times. The police investigation focused on four people: Glover, Clifford Johnny Taylor, Kenny Frye and Steven Liszka. The police also questioned Glover's mother, Gail Loy. In their initial interviews with police, Glover and Taylor stated that they believed Frye and Liszka had been involved. Frye and Liszka implicated Glover and Taylor. Based on this information, the police arrested Glover and Taylor.
>
> Since Glover was a minor at the time of the crime, the Commonwealth moved the Whitley District Court to transfer him to circuit court for trial as an adult, [which that court granted.] . . . Taylor was also charged in a separate indictment.
>
> Prior to trial, Taylor entered into a plea agreement with the Commonwealth in which he agreed to testify against Glover in exchange for a sentence of life without parole for twenty-five years. Taylor also exonerated Frye and Liszka, and testified at trial that he and Glover were the only ones who were involved. On May 25-30, 2000, the charges against Glover were tried before a jury. The jury found Glover guilty of the charged offenses and sentenced him to life without parole for twenty-five years.

*Glover v. Commonwealth*, No. 2007-CA-001349-MR, 2009 WL 152883, at *1 (Ky. Ct. App. Jan. 23, 2009) (hereinafter *Glover I*). On February 12, 2004, Glover filed two post-conviction motions: under Kentucky RCr 11.42 to alter, amend or vacate his conviction, and under Kentucky CR 60.02 for a new trial. *Glover II*, 2016 WL 1178639, at *1. In support of the former, and focusing on witness selection, "Glover argued that he received ineffective assistance from his trial counsel." *Id.* In the 60.02 motion:

> Glover alleged that he was entitled to a new trial based on perjured testimony by Taylor. In support of his CR 60.02 motion, Glover submitted a sworn affidavit from Taylor recanting his trial testimony. Affiant Taylor stated that he committed the crimes on his own and that Glover was not involved. He further stated that he agreed to testify against Glover only after the Commonwealth Attorney threatened to seek the death penalty against him.

*Id.* The Kentucky Court of Appeals issued the final reasoned opinion denying Glover's RCr 11.42 motion on January 23, 2009. *Glover I*, 2009 WL 152883, at *6–7. The same court, albeit after seven years of interim consideration and litigation at the trial and appellate levels, denied Petitioner's CR 60.02 motion on March 26, 2016. *Glover II*, 2016 WL 1178639, at *3. Glover filed the instant petition for a writ of habeas corpus on December 6, 2016. DE 1.

The Court has carefully reviewed the entire record, to include the trial transcript, all briefing, and the state hearings post-conviction (though, based on state rulings, culling the hearing role of the trial prosecutor, as advocate). The Commonwealth's courts thoroughly assessed and reasonably dispensed with each claim Glover now pursues. There is no basis, under the standards of § 2254, to disturb the Kentucky determinations that Taylor's recantation was incredible, that there was no prosecutorial misconduct, or that Glover's counsel provided him effective assistance. As such, this Court should **DENY** the petition.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, established a "'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 125 S. Ct. 847, 853 (2005) (quoting *Woodford v. Visciotti*, 123 S. Ct. 357, 360 (2002) (*per curiam*)). Specifically, AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

3

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In contrast, when a state court has not addressed in any manner the merits of a properly presented claim, the reviewing federal court assesses the claim *de novo*. *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007). A petitioner bears the burden of justifying relief. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003)).

"Under the 'contrary to' clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.'" *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., opinion of the Court for Part II). In this regard, "clearly established law under the Act encompasses more than just bright-line rules laid down by the Court. It also clearly includes legal principles enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002). At the same time, habeas review focuses on the holdings of the Supreme Court, not its *dicta* or holdings of the courts of appeals. *Williams*, 120 S. Ct. at 1523 (regarding *dicta*); *id.* at 1507 (quoting *Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir. 1996)) (regarding reliance on jurisprudence from courts of appeals). Moreover, federal habeas corpus relief generally does not lie for errors in the application of state law unless such errors result in the denial of a fundamentally fair trial. *See Estelle v. McGuire,* 112 S. Ct. 475, 479–80 (1991) ("[I]t is not the

4

province of a federal habeas court to reexamine state-court determinations on state-law questions[.]"); *accord Brooks v. Anderson*, 292 F. App'x 431, 437 (6th Cir. 2008).

As to the "unreasonable application" clause, the Supreme Court has held that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S. Ct. at 1523. The writ may not issue solely because the state court incorrectly applied the relevant Supreme Court precedent; instead, the state court's misapplication must have been objectively unreasonable. *Id.* at 1521–23. In determining whether the state court misapplied Supreme Court precedent, a federal court may look only to the state of the case law "as of the time of the relevant state-court decision." *Id.* at 1523. Ultimately, the habeas court should not grant relief "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 124 S. Ct. 2140, 2149 (2004)).[1]

Concerning any "unreasonable determination of the facts" theory, there is some lack of clarity concerning the interplay between §§ 2254(d)(2) and 2254(e)(1). [2] Each distinctly assures a

---

[1] The Supreme Court has repeatedly cautioned courts in this Circuit about the rarity of warranted relief under § 2254. *See, e.g.*, *Jenkins v. Hutton*, 137 S. Ct. 1769, 1773 (2017) (per curiam) (bluntly stating, *e.g.*, "the Sixth Circuit was wrong"). The AEDPA standard is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). State mishandling, under subsection (d), must essentially be inarguable. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) ("[F]ederal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong."). Unless the state transgresses the clearly established *holdings* of the Supreme Court, or applies them so unreasonably as to exceed fair doubt, statute-based deference commands that the federal courts resist involvement. *See Burt v. Titlow*, 134 S. Ct. 10, 15–16 (2013) ("Recognizing the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.").

[2] Although the Supreme Court declined to guide the interaction in *Wood v. Allen*, 130 S. Ct. 841, 845 (2010), the Sixth Circuit has said,

measure of deference to state courts, but § 2254(e)(1) creates a presumption of validity for all factual determinations subject to rebuttal only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Findings of fact entitled to the presumption include "[p]rimary or historical facts found by state courts," *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), as well as factual findings made by state appellate courts based on the trial record. *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (citing *Sumner v. Mata*, 101 S. Ct. 764, 769 (1981)). However, the presumption does not fully apply when, as with an ineffective assistance claim resolved on the merits, the § 2254 petition involves mixed questions of law and fact. *See Strickland v. Washington*, 104 S. Ct. 2052, 2070 (1984); *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007). In essence, while the clear and convincing standard may not apply to a state court's ultimate evaluation of the totality of the "evidence presented in the state court proceeding," 28 U.S.C. § 2254(d)(2), individual factual determinations still warrant deference. *See Abdur'Rahman v. Bell*, 226 F.3d 696, 702 (6th Cir. 2000). Accordingly, a petitioner that has shown a state court factual determination was incorrect by clear and convincing evidence must still show that the evidence actually presented, and other valid factual findings do not reasonably support the state court's ultimate decision. *See Lambert v. Blackwell*, 387 F.3d 210, 235–36 (3d

---

> With respect to § 2254(d)(2), "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court-proceeding[.]"

*Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (quoting *Miller-El v. Cockrell*, 123 S. Ct. 1029, 1041 (2003)); *see also McMullan v. Booker*, 761 F.3d 662, 670 (6th Cir. 2014). The (d)(2) overlay is "demanding but not insatiable." *Id.* (quotation omitted); *see also Feldman v. Thaler*, 695 F.3d 372, 377 (5th Cir. 2012) (describing (e)(1) as a "supplement[]" to (d)(2), providing an "'arguably more deferential' standard of review for state court findings of fact") (citation omitted).

Cir. 2004) ("In the final analysis however, even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2).").

Even absent an opinion articulating the state court's reasoning, a habeas court yet must determine whether the state court's decision is the result of an unreasonable legal or factual conclusion. *Harrington*, 131 S. Ct. at 784. Indeed, "a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d). . . . Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* Unless the petitioner affirmatively shows that the state court's decision "did *not* involve a determination of the merits of his claim," such as where the opinion expressly states the claim was denied on procedural grounds, § 2254(d) applies on habeas review. *Id.* at 784–85.

## III.    ANALYSIS

The Kentucky Court of Appeals concluded that, contrary to Glover's RCr 11.42 assertions, he received constitutionally effective counsel at trial. That Kentucky Court likewise ultimately rejected Petitioner's RCr 60.02 due process-based claims. The Court will divide its analysis by the two rights Glover claims Kentucky denied him: due process and effective assistance of counsel. However, one common thread runs through Petitioner's arguments. Accompanying each theory is a claim that § 2254(d) deference is inapplicable to the state court decisions. DE 4, at 33, 37, 41, 46, 51. Thus, before analyzing the state court opinions' substance, the Court determines whether Glover has affirmatively shown that these decisions "did not involve a determination of the merits of his claim." *Harrington*, 131 S. Ct. at 784–85.

### A.  Section 2254(d) Applicability

Petitioner presented each of his claims to the state courts, and the Commonwealth denied them. Glover does not assert procedural denials; thus, the Court must presume "that the state court adjudicated the claim on the merits . . . [even if] the state court denied relief summarily, . . . expressly addressed some of the claims but not the one advanced on federal habeas review . . . or confined its analysis to state-law authorities." *Jackson v. Smith*, 745 F.3d 206, 210 (6th Cir. 2014) (citing *Harrington*, 131 S. Ct. at 784–85; *Johnson*, 133 S. Ct. at 1093).

Glover's argument against § 2254(d) deference is based on a fundamental misunderstanding of what constitutes an "adjudication on the merits." For instance, Glover contends that the state court "did not address the claims presented . . . [, but] merely punted the entire matter, seemingly believing that it was categorically bound by the circuit court's brief statements that contained zero explanation." DE 4, at 33. Yet, the merits presumption applies even if "the state court denied relief summarily." *Jackson*, 745 F.3d at 210. Instead, the summary affirmance scenario Glover describes would merely force him to show "there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784. Kentucky here addressed the full merits of Glover's claims, through the course of lengthy state process, and this Court appropriately views those decisions through the lens of § 2254(d).

### B.  Due Process

Glover attacks the state court's dismissal of his RCr 60.02 motion and asserts three due process denial[3] theories. First, Glover argues that Taylor's trial testimony—far and away the

---

[3] Glover presents his due process claims "under the Fifth Amendment to the United States Constitution." DE 1, at 30. However, the Fourteenth Amendment, not the Fifth, delineates *states'* due process responsibilities. *See* U.S. Const. amend. XIV ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law[.]"). Because the precedent Petitioner's argument relies upon applies the proper Amendment, the Court will evaluate

strongest trial evidence of Petitioner's guilt—was perjured, that its presentation made the trial and conviction unreliable and, thus, his ongoing incarceration violates due process. *See* DE 4, at 30–31. Second, Petitioner contends that the prosecution knew, or should have known, of Taylor's perjury and, thus, the Commonwealth eliciting, or failing to correct, his testimony was unconstitutional. *See id.* at 35–36. Third, Glover claims that the Kentucky appellate court's alleged failure to comport with Kentucky standards for evaluating recanted testimony denied him due process. *See id.* at 38–40. The Court addresses each argument in turn.

### 1.  Stand-alone Perjury Claim

Glover contends that the state's alleged presentation of material perjured testimony at his trial violated due process, even if the prosecutor was not (and had no reason to be) aware of the evidence's falsity. DE 4, at 31. Further, Petitioner argues that Taylor's recantation constitutes newly discovered evidence of perjury at his trial.  *Id.* To justify § 2254 relief, newly discovered evidence must bear upon the constitutionality of the applicant's detention. *Cf. Herrera v. Collins*, 113 S. Ct. 853, 860 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.").

Glover's contention, though generally referencing due process, cites to no United States Supreme Court case that recognizes the specific right he asserts. "Even if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error." *Bower v. Curtis*, 118 F. App'x 901, 908 (6th Cir. 2004). "[F]ederal courts traditionally have held that a conviction supported by perjured testimony is not unconstitutional unless the prosecutor or judge

---

Glover's claims under that appropriate rubric. *See, e.g.*, *Durley v. Mayo*, 76 S. Ct. 806, 814 (1956) ("But on the present record, we have a grave miscarriage of justice involving an invasion of federal rights guaranteed by the Fourteenth Amendment.") (Douglas, J., dissenting).

knew or had reason to know that the testimony was perjured[.]" *Dobbert v. Wainwright*, 105 S. Ct. 34, 36 (1984) (Brennan, J., dissenting from denial of certiorari). In short, Glover likely does not cite Supreme Court precedent acknowledging a due process right to trial without perjury (absent prosecutorial misconduct) because it does not exist. *Evenstad v. Carlson*, 470 F.3d 777, 783 (8th Cir. 2006) (finding Supreme Court has never addressed existence of due process violation based on perjury absent prosecutorial knowledge).

Petitioner's precedential support for introduction of perjured testimony as a stand-alone due process violation comes solely from the Kentucky Supreme Court. *See* DE 4, at 30 ("[I]ntroduction of perjured testimony, which is not known as such by the prosecutor, can result in a violation of the right to due course of law and the right to due process of law as provided by the Kentucky and United States Constitutions.") (quoting *Commonwealth v. Spaulding*, 991 S.W.2d 651, 657 (Ky. 1999)). As a federal habeas proceeding, only federal rights here matter. *See also Bower*, 118 F. App'x at 908 ("The duty of federal habeas courts is to ensure that individuals are not unconstitutionally imprisoned; it is not to correct factual errors."). Petitioner's argument centers on the state court's alleged "failure to take into consideration all facts bearing on, and relevant to, a determination of whether Taylor's recantation was credible." DE 4, at 33. However, whether or not the state court's analysis was an "unreasonable application of [the state's own] clearly established law[,]" *id.*, is a matter outside the ambit of § 2254(d) scrutiny. *See Estelle*, 112 S. Ct. at 479–80 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[.]"). The propriety of Kentucky's application of its perjured testimony rule here is a question "simply not cognizable on habeas review." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007).

The Kentucky Court of Appeals wholly upheld the trial court's rejection of Glover's perjury claim. Even if federal law recognizes a co-extensive perjury introduction rule[4], as discussed in detail below, Petitioner fails to overcome § 2254 deference to the factual predicate for the state court's ultimate rejection of his perjury claims—the state found no perjury. The Court sees (and Glover provides) no avenue for treating Kentucky's analysis as resulting in a decision contrary to clearly established federal law. Petitioner's generic constitutional arguments, without citation to controlling federal cases, cannot justify § 2254 relief.

### 2. Perjury & Prosecutorial Misconduct

Glover also contends that the prosecution not only knowingly suborned perjury, but also coerced Taylor to finger Glover with the threat of the death penalty. DE 4, 35–37. "Under *Napue v. Illinois*, 360 U.S. 264, 269–72 (1959), a defendant is denied due process if the prosecutor knowingly offers or fails to correct false testimony." *United States v. Willis*, 374 F. App'x 402, 404 (4th Cir. 2010). "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In order to establish . . . denial of due process, the defendant[] must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). Here, and in the state proceedings, Petitioner centrally relies upon Taylor's post-conviction recantation for both the first and third prong of this test. *See, e.g.*, DE 4, at 14–15.

---

[4] Federally, "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial." *Spencer v. Texas*, 87 S. Ct. 648, 653 (1967). The relevant inquiry is whether "the introduction and identification of the [evidence] so infused the trial with unfairness as to deny due process of law." *Lisenba v. California*, 62 S. Ct. 280, 286 (1941). However, the "Supreme Court has not addressed the issue of whether a due process violation occurs if a conviction is based on perjured testimony which was unknown to the prosecution at the time of trial." *Evenstad*, 470 F.3d at 783. The Court's "limited authority under AEDPA" makes Glover's attempts to "recast [a state law] issue in a constitutional light" unproductive. *Id.* at 784.

11

At the December 7, 2006, evidentiary hearing[5] on Glover's CR 60.02 motion, Clifford Taylor stated that his trial testimony implicating Petitioner in the murder, robbery, and arson was false and resulted from threats by Commonwealth's Attorney Allen Trimble—the prosecutor at trial—and Kentucky State Police Detective Colin Harrell. (CD 1 at 35:10.) Taylor testified he was solely responsible for the crimes Glover was convicted of, and he claimed the prosecutor and detective threatened him[6] with the death penalty if he did not implicate another. *Id.* Finding Taylor's recantation incredible, the Kentucky courts held Glover's falsity and prosecutorial knowledge allegations meritless. Glover contends that the state decision was based upon either "an unreasonable application of clearly established law," or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." DE 4, at 37.

Petitioner's bald assertion of unreasonable legal application is insufficient to overcome § 2254(d)(1) deference. Here, the state court's analysis accounted for[7] and is entirely consistent with the requirements for a *Napue* claim; Glover's dissatisfaction with the results does not render the determination unreasonable. Simply put, the predicate for Glover's constitutional claim is the falsity of Taylor's trial testimony. The trial and appellate courts explicitly found the recantation unreliable: "Here, the trial court found that Taylor's recantation was not credible." *Glover II*, 2016 WL 1178639, at *3. None of the due process issues applies without foundational falsity at

---

[5] Respondent filed the hearing's audio record, DE 13 (Conventional Filing), on two CDs, which the Court will cite by number and time stamp: (CD # at 00:00).

[6] These threats allegedly occurred at the Whitley County Jail, outside the presence of Taylor's then-counsel.

[7] Kentucky expressly relied on state precedent, *Commonwealth v. Spaulding*, 991 S.W.2d 651 (Ky. 1999), that rested on *Giglio v. United States*, 92 S. Ct. 763 (1972)—fully at the core of the *Napue* line—and which utilized the elemental test from *United States v. Lochmondy*, 890 F.2d 817 (6th Cir.1989). *Glover II*, 2016 WL 1178639, at *3 (citing *Spaulding*, 991 S.W.2d 651); *Spaulding*, 991 S.W.2d at 654–56 (explaining test for prosecutorial misconduct claim based on alleged failure to correct perjury) (citing *Giglio*, 92 S. Ct. at 766, and *Lochmondy*, 890 F.2d at 822).

trial, here lacking. Given the centrality of Taylor's recantation to Petitioner's claims, any § 2254(d)(2) contention hinges on state credibility findings. The record evidence supports Kentucky's rejection of the *Napue* claim.[8] Kentucky quite reasonably determined that Taylor's testimony was not credible, and Glover, who endeavors to marshal other evidence, fails to displace the deference built into § 2254(d)(2); he certainly fails to rebut the credibility determination and other findings "by clear and convincing evidence," per § 2254(e)(1).[9]

The Kentucky Court of Appeals identified appropriately universal reluctance toward recanted testimony, reviewed the trial court's credibility determination, and found no basis in the record for disturbing the incredibility finding. *See Glover II*, 2016 WL 1178639, at *3. "Kentucky law has long disfavored recanted testimony and placed little credence upon it[;] . . . [a]ffidavits in which witnesses recant their testimony are quite naturally regarded with great distrust and usually given very little weight." *Glover II*, 2016 WL 1178639, at *3 (internal citations omitted). The Sixth Circuit processed a similar claim under the "fundamental fairness"

---

[8] Taylor's testimony is the only substantial evidence that could support the falsity or prosecutorial knowledge elements.

[9] Glover contends that § 2254(e)(1) deference is inappropriate here because the state fact finders did not conduct an evidentiary hearing. DE 4, at 22 (citing *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2004)). However, here, Judge Braden *did* conduct an evidentiary hearing—in addition to hearing Taylor's testimony at trial. Glover now implies that "the state courts did not have a better opportunity to judge a witness' credibility than" this Court. DE 4 at 22 n.2 (citing *Stumpf v. Mitchell*, 367 F.3d 594, 615 (6th Cir. 2004) *rev'd in part, vacated in part sub nom. on other grounds, Bradshaw v. Stumpf*, 125 S. Ct. 2398 (2005)). The *Stumpf* court found "complete deference" inapplicable because "[n]o court at any level considering Stumpf's claims actually observed [the relevant] testimony." *Stumpf*, 367 F.3d at 615. Glover's situation is distinguishable. Before Judge Winchester—after Judge Braden's hearing—Glover himself stipulated that an additional hearing was unnecessary. DE 11-7, at 658. The state courts had ample opportunity to assess all witnesses' credibility, doubly so for Taylor. This Court's credibility evaluation windows are indisputably inferior. Judge Winchester's decision, consistent with Glover's wishes, to assess the 60.02 motion based on the unobjectionable portions of Judge Braden's hearing do not justify departure from the § 2254(e)(1) presumption. *Cf. Matthews*, 486 F.3d at 889 ("The [§ 2254(e)(1) presumption of correctness also applies to factual findings made by a state appellate court based on the trial record.").

aspects of due process. In *Guidry v. Sheets*, 452 F. App'x 610, 613 (6th Cir. 2011), the Court rejected a petition challenging an Ohio court's refusal to grant a new trial after finding a post-conviction recantation was not credible. The *Guidry* Court applied § 2254(e)(1) deference to state credibility findings and noted the dubious nature of recantation, in general: "These details reinforce our natural distrust of after-the-fact witness recantations." *Id.* (citing *United States v. Lewis*, 338 F.2d 137, 139 (6th Cir. 1964)); *see also Dobbert*, 105 S. Ct. at 36 (1984) (Brennan, J., dissenting from denial of certiorari) (accord).

Nonetheless, Glover identifies seven factors that purportedly support Taylor's credibility in this context:

> Taylor's credible recantation swearing Glover had nothing to do with the crime is supported by many cumulative factors. These include: the ankle bracelet report counsel deprived the jury from hearing indicating it was impossible for Glover to have been at the crime scene the time it would have taken to carry out the crimes; the lack of any physical evidence implicating Glover and only implicating Taylor; Taylor's questionable trial testimony, during which he was impeached on no fewer than 25 points, including the four different stories he had told prior to trial; Taylor's testimony at trial in which he admitted he accepted the plea offer then to testify against Glover to avoid the death penalty; Taylor's insistence to testify at the evidentiary hearing about his recantation even though he was very aware of the fact that it opened (re-opened) the way for perjury charges and the possibility of a death sentence; the fact Taylor's evidentiary hearing testimony mirrored the unsolicited affidavit he had written years prior; and Taylor's legitimate explanation for coming forward with the truth when he did so.

DE 4, at 32. These claims do not carry the factual weight Glover asserts.[10]

---

[10] The Court notes that the Response cites to portions of the original evidentiary hearing that the courts rejecting Petitioner's claims following the second evidentiary hearing did not consider. *See, e.g.*, DE 11-1, at 5–6. The Kentucky Court of Appeals remanded Petitioner's CR 60.02 claims after finding that the Commonwealth's Attorney occupying dual-roles, as both witness and prosecutor, during the first hearing was improper. *Glover I*, 2009 WL 152883, at *5–6. Consequently, the state court at the second evidentiary hearing (and the reviewing court in *Glover II*), though reviewing the first hearing's record, excepted the prosecutor's role other than as witness. Thus, the Court will conduct its deferential review of the state courts' conclusions without considering facts not before those courts.

The Court finds the Kentucky determinations at issue—rejecting recantation and rejecting prosecutorial misconduct—well supported and easily protected by AEDPA's factual deference hedge. Several points lead to this conclusion.

First, the monitoring argument is far from clear or conclusive. Don McFadden himself gave no testimony, and the related records are largely hearsay. The records indicate that Glover had tampered with the bracelet and that he could have been out of range for up to 17 minutes without any alert. DE 11-7, at 626, 628–29. Given the proximity between houses, and the intra-crime story of trips to and from the Sumner home, the Glover home, the shed, and the abutting woods, the timeline and time gaps are surely debatable and inconclusive.

Second, the prosecutor denied any threat and did so credibly. He swore that the threat did not occur, and he forcefully denied the ethical violation of meeting with a represented defendant without counsel present. Indeed, Trimble averred he **never** met with Taylor at the jail, Taylor's sworn location for the key *ex parte* meeting. Quite incredibly, Taylor, despite facing the major life decision of pleading guilty to murder premised on a capital murder threat, did not tell his trial counsel about the alleged threat and improper meeting. Thus, although Taylor was pre-trial on a potential death penalty case and had already implicated himself in his second statement (DE 11-7, at 564–68, 579–80), Taylor purportedly did not discuss with his lawyer what he now claims was the principal impetus for the decision to plead.

Third, Taylor repeatedly promised the jury that he was telling the entire truth. DE 11-7, at 193, 196, 220. Glover's lawyers sharply cross-examined Taylor on his many stories, but he promised the Court and jury that his testimony was accurate. The jury of twelve Kentuckians believed him, as did the trial court.

15

Fourth, Taylor actually had already implicated Glover—while exonerating Glover's mother (DE 11-7, at 569–70, 576)—in his second statement. Thus, while his final confession and testimony exonerated the other boys, Taylor had, since day 2, fingered Glover. *See, e.g.*, DE 11-7, at 580–82. The murky affidavit—Taylor "blacked out" regarding most of the details—surfaced years after trial, after the Commonwealth housed Taylor and Glover at the same prison and the men discussed an affidavit.

Fifth, the Court notes the existence of other evidence. Glover admitted hearing the Sumner burglary plan. DE 11-7, at 551. Further, he acknowledged Taylor was at his home the night before and the morning of the crime. *Id.* at 421–22, 550. Glover was Sumner's neighbor, and booty from the crime ended up in a shed beside Glover's house. Further, police found rope segments that matched Sumner's ligatures on Glover's property. *See id.* at 152 (recovery of rope from Sumner's body and from around shed next to Glover residence), 264 (stipulation to ligature/rope match for appearance, construction, and fiber content).

Sixth, as to prosecutorial misconduct, Taylor actually claimed that authorities had him directly coach Glover prior to Glover's second statement. This, stretching belief, went beyond merely playing the statements of each suspect and involved Taylor, at police urging, allegedly directing Glover on what to say. Kentucky found no credible evidence of prosecutorial misconduct, and Glover has not shown that finding to be unreasonable or clearly wrong.

Thus, the Court, treating Kentucky's factual determinations with the deference AEDPA commands, sees no basis for relief. Judge Winchester had access to the entire record—the trial itself, all exhibits, and the evidentiary hearing. He rejected Taylor's recantation and found no evidence of prosecutorial misconduct. The appellate court accepted Judge Winchester's credibility assessment, refusing to "second guess the trial judge's ruling[.]" *Glover II*, 2016 WL

16

1178639, at *3. Glover touts Taylor's alleged salutary and sacrificial motives,[11] but Kentucky deemed Taylor a liar the second time around, and that treatment, not clearly or demonstrably wrong, deserves deference.

### 3. Post-Trial Procedure

Glover's final contention—that "the Kentucky Courts failed to fully adjudicate and evaluate Taylor's recantation under the standards set forth" in state precedent—warrants little discussion and no relief. DE 4, at 39. Essentially, Petitioner contends that Kentucky's alleged failure to follow its own procedures for evaluating a new trial motion constituted a Fourteenth Amendment violation. In support, Glover points to distinguishable precedent indicating that: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the . . . Due Process Clause." *Evitts v. Lucey*, 105 S. Ct. 830, 839 (1985).

The Court agrees that Kentucky's evaluation of recanted testimony must accord with due process. That truism, though, does not somehow unbind this Court from the clearly established precedent rule, and Petitioner offers no case law suggesting these circumstances present a due process violation. The case Glover relies on mentions state welfare programs and parole policies, and, in substance, addresses a defendant's right to the effective assistance of counsel on a first appeal as of right. *See Evitts*, 105 S. Ct. at 832, 838. Petitioner does not articulate any specifics

---

[11] Glover makes much of Taylor's (eventual) allegedly pure motives, but the Court views it as far from clear that Taylor faced real jeopardy (other than for a perjury prosecution) via his recantation. He already was under a long-final judgment. Whether the Commonwealth legally could have sought relief (or practically, would have sought relief) is a complicated question hinging on a series of legal, factual, and practical matters. The recantation, such as it was, might in theory have opened Taylor to the original case risk; the Court simply views the actual risk as indeterminate, given the fact of final judgment, the passage of time to recantation, and the passage of time to Taylor's 60.02 testimony. Kentucky specifically found the recantation not credible relative to the original sworn trial testimony.

for his due process theory. Rather, the thrust of Glover's argument appears to be that the Commonwealth failed to follow its own procedures; however, state departures from state procedures do not, alone, deny due process. *See Lewis v. Jeffers*, 110 S. Ct. 3092, 3102 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").

Glover provides no bridge for the analytical gulf between process inconsistent with state law and a federal constitutional violation. *See Lambert*, 387 F.3d at 259 ("Of course, labeling a claim as a 'fundamental due process violation' does not actually substantiate a constitutional claim."). It was Glover's burden to point out where the state acted contrary to United States Supreme Court law. Petitioner repeatedly cites state supreme court cases and only complains (with any specificity) that the Commonwealth violated Kentucky Supreme Court rulings. The Court will not second guess the state court's determinations regarding its own procedures; Petitioner's conclusory due process references are insufficient to justify habeas relief.

Further, Kentucky's mode of analysis well tracks federal analysis. *See Guidry*, 452 F. App'x at 613 ("[B]ecause [Petitioner's] claim asserts only a due process violation, and not an independent constitutional infirmity, at best it can succeed only if the denial of the motion for a new trial implicated 'fundamental fairness.' . . . This standard is all the more daunting because [ ] success . . . depends on a federal court making a factual determination that credits [the recanter's] confessions at the expense of her prior trial testimony."). Here, the Commonwealth, after extensive process (including an evidentiary hearing and a remand to assure process adequacy) found that Taylor's trial testimony in fact was not perjured—*i.e.*, that the recantation was unreliable. Glover disagrees, but the Court sees no due process fallibility, certainly nothing in violation of Supreme Court precedent, in the manner by which Kentucky reached its ruling. Petitioner tries to require that Kentucky accept the recantation and then assess the effect of

18

recantation on a likely trial result; that sequencing skips the predicate finding that the recantation be credible. Kentucky found Taylor incredible, and Glover establishes no constitutional problem with the state process yielding that conclusion.

### C. Effective Assistance of Counsel

When asserting an ineffective assistance claim, a petitioner must prove both deficient performance and prejudice. *Strickland*, 104 S. Ct. at 2064; *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (noting that a movant must prove ineffective assistance by a preponderance of the evidence). In order to prove deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 104 S. Ct. at 2064. A petitioner meets this burden by showing "that counsel's representation fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 2064–65; *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (*per curiam*) (giving an overview of the *Strickland* test); *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (same). Judicial scrutiny of counsel's performance, however, is "highly deferential," consisting of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland*, 104 S. Ct. at 2065; *see also Burt*, 134 S. Ct. at 17–18 (referring to "*Strickland*'s strong presumption of effectiveness").

Deficient performance is considered constitutionally prejudicial only when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 104 S. Ct. at 2064. In order to prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 2068. When evaluating prejudice, courts generally must take into consideration the "totality of the evidence before the judge or jury." *Id.* at 2069.

*Strickland* does not require perfect counsel. Rather, the Sixth Amendment assures only a lawyer that performs reasonably, under prevailing professional norms, and does not cause an injury of constitutional prominence. *See, e.g.*, *Otte v. Houk*, 654 F.3d 594 (6th Cir. 2011) ("Not every bad lawyer violates the constitution. For counsel's performance to be deemed ineffective, it must be objectively deficient and cause prejudice to the defendant.") (citing *Strickland*); *Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir. 2008) ("Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, not 'merely wrong.'") (citation omitted); *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) ("So the threshold issue is not whether Morrow's attorney was inadequate; rather, it is whether he was so manifestly ineffective that defeat was snatched from the hands of probable victory.").

On habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 131 S. Ct. at 785. Thus, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* It is "difficult" to establish a state court's application of *Strickland* as unreasonable under § 2254(d); the standards of review for counsel's performance and the state court's evaluation thereof are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (citations omitted); *accord Woods*, 135 S. Ct. at 1376 (When reviewing claims of ineffective assistance of counsel, the Court's review "must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." (internal quotation marks removed) (quoting *Burt*, 134 S. Ct. at 13)). Habeas courts must

"guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Richter*, 131 S. Ct. at 788. Under § 2254(d), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Additionally, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* (citation omitted).

The Kentucky Court of Appeals finally rejected Petitioner's RCr 11.42 motion to vacate or correct his sentence over seven years before finally rejecting his due process claims. *Glover I*, 2009 WL 152883, at *1. Glover's RCr 11.42 motion claimed ineffective assistance based on two sub-allegations:[12] (1) failure to elicit testimony from an allegedly exculpatory witness; and (2) presenting allegedly damaging expert mitigation testimony instead of presenting available beneficial expert mitigation testimony. DE 4, at 42–45, 47–51. The state courts reasoned that the former was a sensible trial strategy and that the latter was strategic and not prejudicial. *Glover I*, 2009 WL 152883, at *6–7. Glover disagrees. DE 4, at 43, 50–51.

The Court secured and has read the full trial transcript and listened to the audio of the post-trial evidentiary hearing. In this context, the Court considers each of Glover's arguments in turn.

### 1. Alleged Alibi Witness

Petitioner states that trial counsel's failure to call Donald McFadden, President of Southern Telephone Company, and to offer into evidence documents regarding the ankle monitor Glover wore during the period of the alleged crimes was deficient performance that prejudiced his trial. Petitioner claims that McFadden, if called, would have testified to the following facts:

---

[12] The Hon. Roger Gibbs and the Hon. Dennis Burke represented Glover at trial.

-- "Glover was on house arrest for an unrelated misdemeanor offense at the time of the crime . . . [and] was required to wear an ankle bracelet to track his whereabouts." DE 4, at 42.

-- "[T]he transmitter had a normal range of 150 feet (plus/minus depending on conditions) and transmitted a signal every so many minutes." *Id.* (also stating crime scene: "some 100 feet outside the range of the transmitter").

-- When McFadden "arrived at Glover's home on the morning of the crime, the bracelet was still attached to Glover's ankle" and that the bracelet was not removed, but had "been nicked." *Id.* at 43 n.38 and accompanying text.

-- Tests of the system "indicated that there was only a 17-minute time lag between the time McFadden placed the bracelet on the [crime scene] porch and the system indicating it was out of range." *Id.* at 43.

-- "Glover's system report indicates that he was within range of his monitor within the time the crime occurred." *Id.*

Accordingly, Petitioner claims, had trial counsel called McFadden, his testimony "would have directly contradicted Taylor's testimony, casting further doubt on his reliability and supporting Glover's claim of innocence." *Id.*

Petitioner ignores the state analysis. This Court does not directly review trial counsel's performance but rather the reasonableness of Kentucky's review of such performance. The Kentucky Court of Appeals appropriately identified the *Strickland* standard. *Glover I*, 2009 WL 152883, at *6. The state court then reviewed the December 7, 2006, post-conviction evidentiary hearing evidence noting many of the same factors Glover highlights here. *Id.* In the end, the Kentucky court found trial counsel's explanations for not calling McFadden to reflect reasonable trial strategy. *Id.* at 7. Namely, "because his testimony did not definitely exonerate Glover and because it would have opened the door to introduction of Glover's juvenile offenses." *Id.* Petitioner's burden was, thus, to show that this was an "[un]reasonable argument [for] counsel satisfy[ing] *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788.

Again, the Court must note several issues Glover minimizes or omits. First, McFadden did not testify, his so-called "report" is unsworn, and the monitoring records are not authenticated. Second, Glover indeed was under house arrest, a question-begging and prejudicial fact. The McFadden test showed a gap of 17 minutes, with the monitor at Sumner's house, before the monitor reported Glover as out-of-range. McFadden reported that the bracelet had been tampered with and that someone had tried to tape over the cut; Glover denied knowledge of that but allegedly admitted trying to slip the device. The events of the night, as depicted by Taylor, had the boys intermittently moving to and from Sumner's home, Glover's home, and the adjacent or abutting land. The putative McFadden proof does not address where (or whether) in those areas Glover would have been in or out of range.

Glover's counsel walked through—as Gibbs said, "debated"—the pros and cons of calling McFadden. Although both sides expected the Commonwealth to call McFadden, it elected against. The defense had McFadden subpoenaed; indeed, he was there and available during the defense case. Despite that, counsel made a sentient and intentional choice against calling him. The lawyers spoke directly with McFadden just before the defense case commenced. (CD 2 at 52:19.) Defense counsel Gibbs noted the danger in disclosing the fact of home incarceration and specifically testified that McFadden's testimony would not have interpreted the records the way the defense sought. (CD 2 at 30:36.) That is, McFadden would not have testified that Glover definitively was home during the crime. Defense counsel Burke noted McFadden as "not 100% favorable" (CD 2 at 57:50) and cited the defense choice for the most conservative approach, *i.e.*, not calling McFadden. (CD 2 at 55:53.)

Judge Braden, who tried the case and processed the RCr 11.42 portion, participated in the trial discussions of McFadden and found that "with the seventeen minute gap before Glover

23

would have been shown to be out of range in this case, it would have been devastating to the Defendant for the jury to have been informed that he was under house arrest[.]" DE 11-7, at 652. The Court of Appeals agreed, accepting counsel's calculus that the testimony would not have exonerated Glover and also carried a negative taint. The defense made a tactical choice, as to a mixed-bag witness, in the trenches at trial.[13]  The temptation to judge that harshly, in light of the trial result, is one the Court resists. *Strickland*, 104 S. Ct. at 2065 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Counsel was prepared, had the witness present, knew the potential proof, spoke directly to McFadden, and deliberatively elected against calling him. This was a rational strategic call and not ineffective assistance.

### 2. *Mitigation Expert Selection*

During the course of Glover's original proceedings, his trial counsel secured two psychological experts. Dr. John P. McGregor testified in support of counsel's attempt to convince the Kentucky district court to keep Glover's case in juvenile court. (CD 2 at 21:15.) Dr. David Finke evaluated Petitioner and testified at sentencing for mitigation purposes. *Id.* Counsel did not call Dr. McGregor during the sentencing phase. Because "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

---

[13] The Court notes that Glover briefly suggests trial counsel's decision not to call McFadden "was not a thought-through strategic decision . . . [but] a spur of the moment decision." DE 4, at 46. Petitioner cherry-picks portions of one trial attorney's testimony, ignoring the other. Both lawyers exhibited significant familiarity with and espoused thoughtful consideration of McFadden's potential testimony. (CD 2 at 30:36 (Gibbs), 58:00 (Burke).) In short, the fact that trial counsel had to decide whether to call McFadden on short notice does not mean the underlying considerations were not thoroughly assessed by counsel. Burke said the lawyers talked directly to McFadden immediately prior to the defense case, showing an advised and informed election against calling him at the time. (CD 2 at 52:50.)

unchallengeable, *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, the review of counsel's performance is unnecessary here." *Bryan v. Bobby*, 843 F.3d 1099, 1115–16 (6th Cir. 2016).

The lawyers worked the case hard, utilized an investigator, employed appropriate experts, and carefully weighed the use of the experts. They even internally debated whether to employ Finke or McGregor at sentencing. The lawyers intentionally chose Finke over McGregor, endeavoring to highlight the treatment benefit and window that could apply to help Glover. This was not the only way to go, and perhaps Burke alone would have chosen differently, but the decision was strategic and well-grounded.

Per Petitioner's description of the evaluations: McGregor concluded that Glover "was an intellectually limited, depressed, emotionally subdued youngster whose recent behavioral functioning has been greatly affected by his chronic substance abuse since 1995." DE 4, at 49. He further found that Glover was functioning at the intellectual level of a child of nine or ten, and had an I.Q. score of 64. *Id.* Dr. Finke's findings included: "extreme, long-standing issues of rage" and "Intermittent Explosive Disorder" characterized by an increased proclivity toward impulsivity and violence. *Id.* Glover's characterizations of the evaluations are unflinchingly self-serving.

Petitioner does not tackle the bases the state court relied upon in rejecting his mitigation-stage IAC claim, namely:

> Dr. Finke also stated that he believed Glover could be successfully treated and could ultimately become a productive member of society. And while Dr. McGregor's report does not contain as strong language as Dr. Finke's, Dr. McGregor's evaluation discussed Glover's early and prolonged use of prescription drugs, marijuana and alcohol; violent behavior problems; and a significant juvenile record. Dr. McGregor also qualified some of his opinions, noting that the information favorable to Glover was derived from his relatives and that Glover was not particularly forthcoming during the evaluation. Dr. McGregor also provisionally diagnosed Glover with mild mental retardation, but noted that this diagnosis was contradicted in light of Glover's academic record.

*Glover I*, 2009 WL 152883, at \*7. The State called this election a choice of proof "ordinarily left to the sound discretion of trial counsel." *Id.*[14] Further, relying upon these contra-indicative factors, the Kentucky court held that Glover had failed to show that Dr. McGregor's report was sufficiently favorable to create a likelihood of a lesser sentence if presented to the jury. *Id.* Stated otherwise, the state court held that Petitioner failed to meet *Strickland*'s prejudice prong.

Glover cites to *Strickland* and one other mitigation-based IAC case. S*ee* DE 4, at 48 (*citing Wiggins*, 123 S. Ct. at 2535). Petitioner does not identify a rule from *Wiggins* that the Kentucky courts ignored, or misapplied. First, counsel had access to both experts, considered both, and made the intentional decision to pursue a theory via Finke instead of the tack taken in the transfer context with McGregor. Gibbs, who had primary authority on mitigation, articulated a specific rationale. (CD 2 at 22:29.) This is classic strategy, sits on a thoughtful foundation, and demonstrates effective assistance. Even if the Court were to assume the performance was deficient (a finding the Court does not make), Petitioner fails to substantiate a prejudice claim. *Strickland* found no prejudice. 104 S. Ct. at 2071. *Wiggins* did find prejudice, but on grounds that are readily distinguishable from Glover's sentencing circumstances. First, *Wiggins* did not address the initial component of Glover's claim, harm resulting from mitigation evidence actually presented, in any way. 123 S. Ct. at 2542–43. Second, the unpresented *Wiggins* evidence was exceedingly strong, with "little . . . double edge." *Id.* at 2542; *compare* DE 11-7, at 488 (Glover's trial counsel Burke during juvenile transfer hearing, referenced Dr. McGregor's testimony, but reasonably described Defendant's drug abuse history as "a double edged

---

[14] Judge Braden likewise refused to "second guess" trial counsel. DE 11-7, at 655.

sword.").[15] As noted by the Kentucky Court of Appeals, Dr. McGregor's report contained significant weaknesses, and a razor-sharp second edge. *Glover I*, 2009 WL 152883, at *7 ("McGregor's evaluation discussed Glover's early and prolonged [drug use]; violent behavior problems; and a significant juvenile record. Dr. McGregor also qualified some of his opinions" including noting that the mild-mental retardation "diagnosis was contradicted in light of Glover's academic record."). *Wiggins* does not advance Glover's claims.

Petitioner summarily states that Dr. Finke's testimony was "unfavorable" and that trial counsel "failed to present the trier of fact with any reason to mitigate" Glover's sentence. DE 4, 52. Petitioner's failure to cogently address the counter-points the state court reasonably relied on to reject his claim is fatal. Glover does not articulate—in the context of the full trial and sentencing record—how the alleged errors by counsel, leading to the testimony (and omission) at issue, satisfy the *Strickland* prejudice prong. The state decision reasonably identifies strengths in Finke's testimony and weaknesses in McGregor's. *See also* DE 11-7, at 490 (transfer hearing judge noted his belief in Dr. McGregor's sincerity despite some of his answers "not necessarily [being] in Mr. Glover's criminal favor"). Petitioner offers no persuasive argument that the same factfinder—having found Glover guilty of a gruesome murder, robbery, and arson—might have

---

[15] Glover also cites to several distinguishable Sixth Circuit applications of *Strickland*. DE 4, at 48 n.40. Each case found deficiency and resulting prejudice in counsel's failure to investigate—not alleged here. *Hamblin v. Mitchell* found prejudice in defense counsel's "utter failure" to present a wealth of available, but undiscovered, mitigating evidence. 354 F.3d 482, 493 (6th Cir. 2003). *Powell v. Collins* reversed a writ denial (mostly) because the sole defense expert stated that it "was a good thing Petitioner is not bigger, heavier, or smarter, or he would be just that much more dangerous[,]" and during sentencing deliberations "the jury informed the court that it was 'at a stalemate' and could not agree whether to impose a death sentence." 332 F.3d 376, 401 (6th Cir. 2003). Finally, in *Austin v. Bell*, defense counsel "did not present any mitigating evidence because he did not think that it would do any good." 126 F.3d 843, 849 (6th Cir. 1997). Dr. McGregor's testimony was clearly not as favorable as the unpresented and undiscovered testimony in *Hamblin*; nor was Finke's testimony as damning as the *Powell* expert. There is no indication that the jury was especially susceptible to being swayed from its sentencing decision. The divergence in this case's circumstances from *Austin* is self-evident.

given him a lighter sentence based on conflicting evidence of mental deficiencies tainted by recidivist tendencies and drug abuse. *See Bryan*, 843 F.3d at 1115–16 ("Bryan killed a police officer, and repeatedly tried to kill another man, all while trying to escape arrest for another committed offense . . . it is not reasonably probable that submitting Bryan's broken childhood and mixed prison record would have changed the outcome of the penalty phase.").

The Court has reviewed both Drs. Finke's and McGregor's reports, DE 11-7, at 634, 640, McGregor's transfer hearing testimony, *id*. at 442–87, and Finke's sentencing testimony. *Id.* at 300–15. In addition to the (unaddressed) Kentucky observations, several other factors reduce any miniscule probability that Glover's proposed deficiency cure would result in a sentencing variation. Glover claims "vast differences" between the two evaluations, but focuses principally on Finke's "intermittent explosive disorder diagnosis." DE 4, at 49–50. Yet, the reports exhibit remarkable consistency, and Glover does not account for relevant variances in case posture.

Dr. Finke interviewed Glover after nearly a year and a half (June 23, 1998–November 13, 1999) of incarceration following Dr. McGregor's interview. Dr. Finke testified to a jury that had already found Petitioner guilty of stabbing an elderly woman 30+ times,[16] rather than to a judge evaluating transfer of a 15-year old who had not yet been indicted. Unlike Dr. McGregor, Dr. Finke found no malingering evidence during his evaluation. Thus, Dr. Finke's report resulted from a more forthcoming Glover testimonial, was aided by a complete record of the pending allegations, and followed a lengthy stressful period resulting in Glover-attested symptoms that, given the disorder's nature, are not constantly expressed. Glover's implicit speculation is that Dr. McGregor's report would not have changed with updated information. However, Petitioner's

---

[16] McGregor's report notes that his evaluation was conducted without police records; thus, there is no clear evidence that he had access to charge specifics. DE 11-7, at 641.

unsubstantiated theorizing does not corroborate his prejudice claim—presumed hypothetical results are not proof, and they can easily be molded to an alternative argument.

Moreover, the two doctors' evaluations are strikingly consistent, and their findings are coextensive as to nearly every mitigating factor. Perhaps most significantly, both doctors opined that Glover could not only be rehabilitated, but that proper treatment could significantly reduce his risk profile in the relatively (as compared to the ultimate sentence) short-term—roughly 3–5 years. DE 11-7, at 310, 464. Both doctors noted (1) the effect of Petitioner's father's suicide when he was two years old, (2) the inadequacy of his mother's parenting, and (3) Glover's unstable living situation. *Id.* at 305–06, 449. Dr. Finke also confirmed Dr. McGregor's tentative diagnosis of below average intellectual functioning. *Id.* at 304–05, 447. Finally, despite Petitioner's complaint that Finke rendered his opinion without the benefit of family interviews, Glover's aunt, herself, testified in support of numerous mitigating elements at sentencing. *Id.* at 295–300. Contrary to Petitioner's contention, his trial counsel offered the fact-finder numerous mitigation bases. The jury simply did not respond to the proof.

Kentucky reasonably evaluated and processed the *Strickland* claims, largely deferring to the well-considered choices counsel made in presenting proof at trial. The Court, in the doubly-deferential world of § 2254 and *Strickland*, sees no factual or legal reason to question or interfere with the reasonable state treatment of the issues.

## IV.    CERTIFICATE OF APPEALABILITY

A Certificate of Appealability may issue where a petitioner has made a "substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This standard requires a petitioner to demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S. Ct. 1595,

1604 (2000); *see also Miller-El*, 123 S. Ct. at 1039-40 (discussing development of standard). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *Bradley v. Birkett*, 156 F. App'x 771, 774 (6th Cir. 2005) (noting requirement of "individualized assessment of . . . claims") (citing *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)). For dismissals on procedural grounds, as to when a Certificate of Appealability should issue, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 120 S. Ct. at 1604.

Petitioner has not made a "substantial showing" as to any claimed denial of rights; his claims conclusively fail. Reasonable jurists would not find the Court's substantive and procedural determinations debatable. Accordingly, the Court recommends that the District Court entirely deny a Certificate of Appealability.

## V.      CONCLUSION

For the stated reasons, the Court **RECOMMENDS** that the District Judge **DISMISS WITH PREJUDICE** the amended petition (DE 4) and **DENY** a Certificate of Appealability.

\*     \*     \*     \*     \*     \*

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, de novo, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court

of Appeals. *Thomas v. Arn*, 106 S. Ct. 466 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 11th day of December, 2017.

**Signed By:**

**Robert E. Wier**

**United States Magistrate Judge**